**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: September 30 2022**

John P. Gustafson
United States Bankruptcy Judge

<br>

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 20-32869 |
| | ) | |
| Lucille L. Mann and | ) | Chapter 7 |
| John H. Mann, | ) | |
| | ) | Adv. Pro. No. 21-03019 |
| Debtors. | ) | |
| | ) | Judge John P. Gustafson |
| The First Citizens National Bank of Upper | ) | |
| Sandusky, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Lucille L. Mann and | ) | |
| John H. Mann, *Deceased*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OF DECISION AND ORDER REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

First Citizens National Bank of Upper Sandusky ("Plaintiff"), an unsecured creditor in this

Chapter 7 case, commenced this adversary proceeding by filing a Complaint seeking a

determination of the dischargeability of a debt, consisting of credit card charges owed to Plaintiff by Defendants Lucille L. Mann and John H. Mann ("Manns"), the Chapter 7 debtors.[1]  Plaintiff's Complaint alleged that the debt should be excepted from discharge on alternative legal theories under 11 U.S.C. §523(a)(2)(A).  Plaintiff has filed a Motion for Summary Judgment against Lucille L. Mann ("Defendant").  Defendant did not file a response.  The matter is now decisional.

### JURISDICTION AND VENUE

The district court has jurisdiction over this adversary proceeding under 28 U.S.C. §1334(b) as a civil proceeding arising in or related to a case under Title 11.  This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. §157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine the dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. §157(b)(1) and (b)(2)(I).  Venue is proper under 28 U.S.C. §1409(a).

The Claims Register reflects that on April 12, 2021, a claim was filed on behalf of Plaintiff. [Case No. 20-32869, Claim No. 5-1].  Plaintiff's claim against Defendant was not listed as liquidated in the Manns' Schedules; it appears no court has yet determined either liability or damages. [Case No. 20-32869, Doc. #1, Schedule E/F, p. 21].  However, bankruptcy courts can enter a judgment that fixes the amount, if any, of unliquidated claims in the context of determining the dischargeability of the underlying debt. *Hart v. S. Heritage Bank* (*In re Hart*), 564 F. App'x 773, 775–76 (6th Cir. 2014); *Waldman v. Stone*, 698 F.3d 910, 919–20 (6th Cir. 2012); *Longo v. McLaren* (*In re McLaren*), 3 F.3d 958, 965–66 (6th Cir. 1993).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P.

---

1/  Initially, Plaintiff filed this adversary proceeding against John H. Mann and Lucille L. Mann.  Counsel for the Manns filed a Suggestion of Death notifying this court that John H. Mann passed away on May 26, 2021. [Doc. #16]. Plaintiff no longer seeks nondischargeability against John H. Mann. [Doc. #44, p.1 n.1].

7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, considered all of the evidence, and reviewed the entire record in the case.[2]  Based upon that review, and for the reasons discussed below, the court finds, at this stage of the proceeding, that Plaintiff has not established that this debt is nondischargeable.

## FACTUAL BACKGROUND

At the time the bankruptcy petition was filed, the Manns were retired.  The Manns had a combined monthly income of $3,966.52, consisting of social security and pension or retirement income, with monthly expenses of $2,730.50, according to Schedules I and J.  During the pendency of this adversary proceeding, John H. Mann passed away.  Defendant Lucille L. Mann, the remaining Defendant, is elderly.  There is no evidence that she is financially sophisticated.

Although the record is not clear as to the reason, it appears Defendant's daughter had a power-of-attorney over at least some of the Defendant's financial affairs. [Doc. #1, ¶15].

Plaintiff attached a partial transcript of Defendant's deposition.[3]  The submitted portions of the transcript does not include any questions about Defendant's age, occupation, or background.[4]

Nearly twenty years ago, in February 2003, Lucille L. Mann and John H. Mann obtained a

---

2/  On summary judgment the types of evidence the court may consider are governed, in part, by Federal Rules of Civil Procedure 56(c)(1)(A)–(B).  Furthermore, Federal Rule of Civil Procedure 56(c)(3) provides that: "The court need consider only the cited materials, but it may consider other materials in the record."

3/  Plaintiff did not provide a full transcript of Defendant's deposition testimony.  Plaintiff attached a copy of the pages of the deposition transcript that contained the testimony referenced in its Motion for Summary Judgment.  The pages filed were the first three pages, pages nine through thirteen, pages seventeen through nineteen, pages twenty-one through twenty-two, page twenty-six, and page thirty.  [Doc. #44-1, pp. 1–16].  The pagination of the deposition transcript does not match the pagination assigned by CM/ECF online docketing system.  To be clear, the court will refer to the excerpts of Defendant's deposition testimony according to the deposition transcript's pagination, e.g. p. 17.  For the other materials in the record, the court will refer to the pagination assigned by CM/ECF online docketing system.

4/  The court notes that age, occupation, and other general background questions are usually asked at the start of a deposition.  The first page of the excerpts filed with the Motion for Summary Judgment that include Defendant's deposition testimony is page nine of the deposition transcript.

3

"preapproved" credit card from Plaintiff. [Doc. #44-2, p. 6]. The card was used for ordinary purposes. [Doc. #44-1, p. 10:10–25]. For example, the card was used for oil changes and getting "gas for [Defendant's] car." [*Id.*, pp. 17:10–14, 22:15–20]. The card was also used for some ordinary purposes during the period of this gift card scam. [Doc. #44-1, pp. 41–42].

In addition to this credit card, Defendant also had a checking and savings account with Plaintiff. [Doc. #1, ¶13].

In October or November 2019, Defendant began purchasing gift cards for an unknown third party she met online.[5] [Doc. #1, ¶¶12–15]; [Doc. #44-1, p. 22:3–8]. Defendant first used money from her checking and savings account with Plaintiff to purchase the gift cards. [Doc. #1, ¶13]. A family member, likely Defendant's daughter through a power-of-attorney, closed the checking and savings account with Plaintiff and informed Defendant that purchasing these gift cards was a scam. [*Id.*, ¶¶14–15]; [Doc. #44-1, pp. 19:19–24, 21:15–19].

However, Defendant did not stop making purchases. Instead, between November 2019 and December 2019, Defendant turned to using her credit card to buy gift cards. [Doc. #44-1, p. 26:4–7]. The credit card account was also with Plaintiff. [Doc. #1, ¶¶8–11]. The charges, consisting of gift cards, purchased at grocery stores and drug stores, were unlike her previous charges on that card. [Doc. #1, ¶¶12, 17]; [Doc. #44-1, pp. 21–39, 41–42]. Like the gift cards purchased with money from her checking and savings account, the gift cards purchased with the credit card were not for Defendant. [Doc. #44-1, pp. 13:13–18, 17:15–21, 22:3–20, 26:1–3]. Instead, these gift cards were for an unknown third party. [*Id.*]. For each purchased gift card, Defendant "was being scammed." [*Id.*, p. 13:4–12].

---

5/ Plaintiff's Motion for Summary Judgment recognizes that this is an unknown third party and any references to this unknown third party as "John Coleman" in its Motion are done for ease of reference since this is likely a fictitious name. [Doc. #44, p. 2 n.5].

## I.    The Nature of the "Scam."

This unknown third party's arrangement with Defendant was relatively straight forward. [Doc. #1, ¶¶12–15]; [Doc. #44-1, p. 22:3–8].

First, the unknown third party requested that Defendant go to a nearby grocery store or drug store to buy one or more gift cards. [Doc. #44-1, pp. 13:4–25, 17:15–24, 18:1–15]. In return, the unknown third party promised Defendant a "big amount of money after [Defendant] paid this much money to him." [*Id.*, p. 18:5–11]. Defendant believed by purchasing these gift cards she "was supposed to get a large amount of money." [*Id.*, p. 17:22–25]. After buying the gift cards, Defendant would then send the unknown third party the card's information. [*Id.*, pp. 13:11–21, 21:3–7, 22:3–8].

Next, the unknown third party knew that to incur more charges, he would need to make "payments" on Defendant's account. [Doc. #1, ¶19]; [Doc. #44-1, p. 19:4–18]. However, all of these "payments" made by the unknown third party were ultimately disallowed or rejected. [*Id.*, p. 22:21–23]. Despite these "payments" ultimately being rejected, they accomplished and facilitated the purchase of gift cards. These "payments" increased Defendant's available credit, allowing further purchases to be immediately made, despite Defendant's credit limit being $12,000.00. [*Id.*, p. 19:4–18]; [Doc. #44-2, pp. 41–42]. For example, after the unknown third party would make a "payment," on that same day he would request that the Defendant go to a nearby grocery store or drug store to buy one or more gift cards, and then asked Defendant to send him the information on the gift cards. [Doc. #44-1, p. 22:3–8]. Once the balance neared the $12,000.00 limit again, the unknown third party would make a "payment," and then on that same day would request that the Defendant go buy more gift cards. [Doc. #44-1, pp. 41–42].

However, Defendant was unaware of these "payments" on her credit card account by the unknown third party. [Doc. #44-1, pp. 19:19–24, 21:15–19]. After the fact, Defendant realized

that these purported "payments" were not "real money," [*Id.*, p. 18:12–18], and her deposition testimony describes her as falling for a scam in which she was used, allowing the scammer to repeatedly tap her account.

Defendant did not believe she had to pay the credit card charges used to purchase gift cards. [*Id.*, p. 22:9–14]. The reason Defendant did not believe she had to pay the credit charges was because the unknown third party assured Defendant that he would pay back the credit card debt consisting of purchased gift cards. [*Id.*, pp. 17:22–25, 18:1–4, 21:15–23, 22:9–14, 26:13–16, 30:7–16]. And, "payments"—although ultimately disallowed—were made to Plaintiff by the scammer. [*Id.*, p. 18:16–18].

Thus, it was Defendant's testimony at her deposition that she was relying on the unknown third party to ultimately pay the gift card charges.[6] But, Defendant did not rely on the unknown third party to make the specific interval "payments" that replenished her available credit, making credit immediately available.[7] Defendant testified she was unaware that this unknown third party

---

6/ For example, Defendant's deposition testimony states she was not going to pay the credit card charges because she believed the unknown third party was going to pay the debt:

> Q. And then the plan was that you weren't going to have to pay those [purchases] back, he was going to pay?
> A. Right. I was supposed to get a large amount of money.

[Doc. #44-1, p. 17:22–25].

7/ Defendant's deposition testimony indicates she lacked knowledge regarding the "payments" made by the unknown third party:

> Q. So is it fair to say there's several of the My Card payments listed on this list?
> A. So that has to be from him because I didn't even know about My Card payments.
> . . . . .
> Q. And then at that point in time did he tell you he made those payments?
> A. No, he never told me. The way I found out was through my daughter. She had either went to the bank or they called her or something, and I didn't know that had happened.
> . . . . .
> Q. And then he also said that he would make the payment on the credit card or he did make the payment on the credit card?
> A. Yes, he did. He didn't tell me he was going to.

[*Id.*, pp. 17:6–9, 19:19–24, 21:15–19].

6

was in possession of the information needed to make payments and did not know that he made the interval "payments." [*Id.*, pp. 17:6–9, 19:19–24].

In fact, this unknown third party did have the necessary information to make the credit card payments.[8]  Plaintiff attached an Affidavit of Jennifer A. Romich, the Senior Vice President and Chief Lending Officer with the bank, averring that this necessary "confidential information" included the name on the credit card, the credit card's expiration date, billing zip code, the last four digits of the account owner's social security number, the maiden name of the account owner's mother, and the account owner's birthdate.  [Doc. #44-2, p. 3, ¶¶5, 12].

For Defendant's December 2019 credit card statement cycle, Defendant had made over $40,000.00 in purchases, far in excess of her credit limit of $12,000.00. [Doc. #44-1, pp. 34–37].

Summarizing Defendant's deposition testimony, her testimony reflects that she held a belief while she incurred the debt that any gift card related charges, whatever they were, would be paid by the unknown third party, and that she was going to receive a larger amount of money after the transmittal of the gift cards. [Doc. #44-1, p. 17:22–25]("Q.  And then the plan was that you weren't really going to have to those back, he was going to pay?  A.  Right.  I was supposed to get a large amount of money."); [*Id.*, p. 21:20–23]("Q.  He also told you at the end of the day when all this is cleared up or whatever that you would receive a large sum of money from him.  A.  Yes, when I paid him so much money.").

Between November 3, 2019 and December 29, 2019, Defendant appears to have made

---

8/  When asked about the "payments," Defendant stated she did not give the unknown third party her account information and was unaware how the unknown third party had the account information to make the "payments" on her account:

> Q. So did you give him your account information so he could send in a payment?
> A. I don't believe I did.  I think he just knew probably from my card -- I don't know, somehow he knew.

[*Id.*, p. 17:1–5].

twenty-eight purchases of gift cards totaling about $50,800.00. [Doc. #44-1, pp. 41–42]. Between December 13, 2019 and January 3, 2020, the unknown third party made ten payments totaling $79,662.05, which were all ultimately rejected or disallowed. [*Id.*]. Plaintiff relied on the unknown third party's payments, which replenished the available credit, and Plaintiff felt justified in doing so because the unknown third party needed the "confidential information" noted above to make payments. [Doc. #44-2, ¶12].

The timeline of Defendant's purchases of gift cards, and the unknown third party's "payments," are detailed immediately below.

## II.   Timeline of Defendant's Purchases and the Unknown Third Party's "Payments."

Between November 3 and November 6, 2019, Defendant made four purchases totaling $4,000.00. [Doc. #44-1, p. 41]. The charges between November 3 and November 6, 2019, "set off the VISA fraud warnings on the account." [Doc. #44-2, p. 3, ¶10]. Defendant verified that she did, in fact, makes those charges. [*Id.*]. Based on her response, Plaintiff processed these charges, and because Defendant "verified those charges, future similar charges did not raise fraud warnings." [*Id.*].

On November 8, 2019, Defendant made two purchases of gift cards totaling $2,500.00. [Doc. #44-1, p. 41].

On November 9, 2019, Defendant made one purchase totaling $2,000.00. [*Id.*]. There were no other gift card purchases in November 2019.

In December 2019, additional gift cards were purchased. However, as noted above, Defendant's credit limit was $12,000.00 and Defendant had not made any payments on her account for the month of November 2019 that would allow further purchases of gift cards to be made. [Doc. #44-1, p. 19:4–10]. To purchase more gift cards, a payment would need to be made on the account. [*Id.*, 19:11–14]. On December 11, 2019, the unknown third party made a payment of $9,460.00.

8

[Doc. #44-1, p. 41]. On December 13, 2019 the unknown third party made a payment of $2,485.93.

[*Id.*].[9] These payments were made online by logging in to Defendant's account. This method differed from Defendant's previous payments. The payments totaled an amount close to Defendant's credit limit. Apparently, these electronic payments did not set off any fraud warnings on the account.

Between December 12 and December 15, 2019, Defendant made seven purchases totaling $11,700.00. [*Id.*].

This process continued for the month of December 2019:

- On December 16, 2019, the unknown third party made a credit card payment of $6,800.00.

- On December 17, 2019, the unknown third party made a credit card payment of $4,000.00.

- On December 17, 2019, Defendant made three gift card purchases totaling $6,000.00.

- On December 19, 2019, the unknown third party made a credit card payment of $7,015.40.

- Between December 19 and December 21, 2019, Defendant made five gift card purchases totaling $11,200.00.

- On December 23, 2019, the unknown third party made a credit card payment of $11,238.00.

On December 24, 2019, the unknown third party's payment (the $6,800.00 payment made on December 16, 2019) was returned. [*Id.*].

- On December 24, 2019, Defendant made one gift card purchase of $3,000.00.

- On December 26, 2019, the unknown third party made a credit card payment of $9,468.00.

---

9/ At an unspecified date, Defendant's daughter informed Defendant about these payments. [Doc. #44, p. 19:19–24]("Q. And then at that point in time did he tell you he made those payments? A. No, he never told me. The way I found out was through my daughter. She had either went to the bank or they called her or something, and I didn't know that had happened.").

- Between December 27 and December 29, 2019, Defendant made six credit card purchases totaling $11,900.00. Defendant's final purchase of gift cards was on December 29, 2019.

- On December 30, 2019, the unknown third party made a credit card payment of $7,700.00

On December 31, 2019, the unknown third party's payment (the $9,468.00 payment made on December 26, 2019) was returned. [*Id.*].

- On January 2, 2020, the unknown third party made a credit card payment of $13,765.72.

On January 2, 2020, the unknown third party's payment (the $7,700.00 payment made on December 30, 2019) was returned. [*Id.*].

- On January 3, 2020, the unknown third party made a payment of $7,729.00.

Between January 3 and January 8, 2020, the rest of the unknown third party's payments (the $9,460.00, $2,485.93, $4,000.00, $7,015.40, $11,238.00, $13,765.72, $7,729.00 payments made between December 11, 2019 and January 3, 2020) were all returned. [Doc. #44-1, pp. 41–42].

Once all the payments started being returned and the balanced ballooned, Defendant realized she had been "scammed." [Doc. #44-1, p. 13:4–12]. Defendant then ceased all communication with the unknown third party and "blocked him." [*Id.*, p. 30:1–6]. Defendant did not have any additional communication with the unknown third party. [*Id.*]. However, this left Defendant owing over $50,000.00. [Doc. #44-2, p. 4, ¶13].

On December 15, 2020, almost a year later, the Manns filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. On April 9, 2021, Plaintiff filed this adversary proceeding against the Manns seeking a determination that the debt was nondischargeable under §523(a)(2)(A). The Manns were served on April 13, 2021.

On May 11, 2021, the Manns filed their First Answer to the Complaint.

On May 18, 2021, this court held a pretrial hearing. Counsel for Defendant did not appear because he was in a jury trial. At this hearing, counsel for Plaintiff indicated John H. Mann passed away. This court continued the pretrial hearing to May 26, 2021.

On May 26, 2021, this court held a second pretrial hearing. During the hearing, counsel for Defendant indicated Defendant was elderly stating that she was approximately seventy-five or seventy-six years old. Counsel for Defendant further indicated Defendant was involved in an internet scam and Defendant did not know the individual that scammed her.

That same day, this court entered an order setting a further pretrial conference for August 17, 2021, ordering that discovery would be commenced in time to be completed by July 7, 2021, and requiring counsel for Defendant to file a Suggestion of Death for John H. Mann within seven days.

On June 9, 2021, counsel filed a Suggestion of Death notifying this court that John H. Mann passed away on May 6, 2021.

At the request of both parties, this court continued this adversary proceeding pending the U.S. Trustee's decision whether or not to file a motion to dismiss or file a complaint objecting to discharge.

On October 5, 2021, this court held another pretrial hearing. Counsel for Plaintiff informed the court it intended to conduct a deposition via zoom and asked if court approval would be needed. The court indicated no issue would be raised regrading conducting a deposition via zoom based on Defendant's age and the underlying health concerns caused by the pandemic.

On January 13, 2022, this court held another pretrial hearing. An Adversary Proceeding Scheduling Order was entered, setting a further pretrial hearing for April 5, 2022, and ordering that discovery would be commenced in time to be completed by March 31, 2022.

On April 5, 2022, another pretrial hearing was held and a Second Adversary Proceeding Scheduling Order was entered continuing the hearing to May 11, 2022 to allow clarity as to the availability of the deposition transcripts.

On May 11, 2022, this matter came before the court for further pretrial hearing. Plaintiff requested that the court set a dispositive motion schedule. Accordingly, the court ordered that any dispositive motions be filed by June 13, 2022, with any responses filed by June 27, 2022, and any replies filed by July 8, 2022.

On June 13, 2022, Plaintiff filed its Motion for Summary Judgment. Defendant did not file a response.

## SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, summary judgment is proper only when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Wilson v. Gregory*, 3 F.4th 844, 855 (6th Cir. 2021). In reviewing a motion for summary judgment all inferences must be viewed in the light most favorable to the non-moving party. *See, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986).

The party moving for summary judgment always bears the initial burden of informing the court of the basis for its motion, "and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When the moving party has met its initial burden, the adverse party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."

12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2507, 91 L.Ed.2d 202 (1986).

A genuine issue for trial exists if the evidence is such that a reasonable factfinder could find for the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "The non-moving party, however, must provide more than mere allegations or denials . . . without giving any significant probative evidence to support" its position. *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

"When faced with an unopposed motion for summary judgement, a trial court must conduct its own independent threshold inquiry into the sufficiency of the motion's legal and factual basis." *Murrell v. Edsouth* (*In re Murrell*), 605 B.R. 464, 469 (Bankr. N.D. Ohio 2019). In other words, "the trial court must indeed intelligently and carefully review the legitimacy of such an unresponded-to motion, even as it refrains from actively pursuing advocacy or inventing the *riposte* for a silent party." *Id.* (quoting *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405 (6th Cir. 1992)).

## LAW AND ANALYSIS

Plaintiff's Complaint asserts claims under §523(a)(2)(A), alleging the debt for the credit card charges is nondischargeable. The Sixth Circuit has held "that exceptions to discharge in §523(a) must be narrowly construed." *Bd. of Trs. v. Bucci* (*In re Bucci*), 493 F.3d 635, 642 (6th Cir. 2007); *see also Pazdzierz v. First Am. Title Ins. Co.* (*In re Pazdzierz*), 718 F.3d 582, 586 (6th Cir. 2013)("[E]xceptions to discharge are to be strictly construed against the creditor." (citation omitted)); *Meyers v. IRS* (*In re Meyers*), 196 F.3d 622, 624 (6th Cir. 1999); *XL/Datacomp, Inc. v. Wilson* (*In re Omegas Grp., Inc.*), 16 F.3d 1443, 1452 (6th Cir. 1994). A creditor must prove a debt is excepted from discharge by a preponderance of the evidence. *Conti v. Arrowood Indem. Co.* (*In re Conti*), 982 F.3d 445, 448 (6th Cir. 2020).

## I.   11 U.S.C. §523(a)(2)(A).

Section 523(a) excepts from discharge a debt "for money, property, services, or an extension renewal, or refinancing of credit to the extent obtained by" false pretenses, a false representation, or actual fraud. 11 U.S.C. §523(a)(2)(A); *WLP Cap., Inc. v. Tolliver* (*In re Tolliver*), 2021 WL 6061853 at *12, 2021 Bankr. LEXIS 3463 at *39 (B.A.P. 6th Cir. Dec. 20, 2021)(quoting *Kraus Anderson Cap., Inc. v. Bradley* (*In re Bradley*), 507 B.R. 192, 205 (B.A.P. 6th Cir. 2014)); *Lowery v. Iftiu* (*In re Iftiu*), 608 B.R. 677, 689 (Bankr. N.D. Ohio 2019); *Launder v. Doll* (*In re Doll*), 585 B.R. 446, 454 (Bankr. N.D. Ohio 2018); *Risk v. Hunter* (*In re Hunter*), 535 B.R. 203, 213 (Bankr. N.D. Ohio 2015); *Am. Express Centurion Bank v. Arrington* (*In re Arrington*), 2014 WL 3339599 at *3, 2014 Bankr. LEXIS 2928 at *7 (Bankr. N.D. Ohio July 8, 2014).

Under §523(a)(2)(A), "false representations and false pretenses encompass statements that falsely purport to depict current or past facts." *In re Iftiu*, 608 B.R. at 689 (citation omitted). A "false representation involves an express representation." *Id.* (citation omitted); *see also, In re Doll*, 585 B.R. at 455. A "false pretense involves an implied misrepresentation or conduct that is intended to create and foster a false impression." *In re Tolliver*, 2021 WL 6061853 at *17 (citation omitted); *see also, In re Iftiu*, 608 B.R. at 689; *In re Doll*, 585 B.R. at 455. "Actual fraud" is a broader ground for excepting a debt from discharge and encompasses certain frauds that do not depend on a misrepresentation as a necessary condition for a finding of dischargeability. *See, Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 361–62, 136 S.Ct. 1581, 1587–88, 194 L.Ed.2d 655 (2016); *Sun Fed. Credit Union v. Montague* (*In re Montague*), 2021 WL 2816326 at *4, 2021 Bankr. LEXIS 1787 at *10 (Bankr. N.D. Ohio July 6, 2021)(Whipple, J.); *In re Doll*, 585 B.R. at 455; *In re Iftiu*, 608 B.R. at 689; *Meade v. Pinkerman* (*In re Alwood*) 531 B.R. 182, 187 (Bankr. N.D. Ohio 2015).

### A. First Claim for Relief.

Plaintiff's first claim for relief in its Complaint alleges "false pretenses, a false representation, or actual fraud" perpetrated by Defendant's representations to Plaintiff through credit card usage. Plaintiff's Complaint specifically alleges Defendant represented that she would repay the debt. According to Sixth Circuit precedent, since this claim involves credit card transactions, Plaintiff must prove these elements:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;
>
> (2) the debtor intended to deceive the creditor;
>
> (3) the creditor justifiably relied on the false representation; and
>
> (4) its reliance was the proximate cause of the loss.

*Rembert v. AT & T Universal Card Servs., Inc.* (*In re Rembert*), 141 F.3d 277, 280–81 (6th Cir. 1998)(footnote omitted).

For the reasons below, Plaintiff has not established nondischargeability, on summary judgment, nor a specific amount that should be held nondischargeable.

#### 1. "Debtor Intended to Deceive the Creditor."

Plaintiff must establish that a debtor possessed an intent to deceive under the second prong of *Rembert*.

A debtor's intent to deceive is measured by a subjective standard, and this "intention—or lack thereof—must be ascertained by the totality of the circumstances." *Id.* ("Thus, we hold that the proper inquiry to determine a debtor's fraudulent intent is whether the debtor subjectively intended to repay the debt."). "A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's 'course of conduct,' given that direct, express proof of intent is rarely available." *In re Iftiu*, 608 B.R. at 689–90 (collecting cases).

15

When "a debtor's subjective intent is at issue, summary judgment is generally inappropriate unless all reasonable inferences defeat the claims of the opposing party." *In re Doll*, 585 B.R. at 463 ("[W]hen facts . . . are capable of supporting conflicting yet plausible inferences . . . then the choice between those inferences is not for the court on summary judgment." (citation omitted)). In contrast, at trial, if there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor. *Id.* at 463; *In re Iftiu*, 608 B.R. at 690.

In support of its Motion, Plaintiff points to Defendant's admission that she believed she would not need to repay the debt, and therefore did not have an intent to pay the debt at the time the credit card charges were incurred. Plaintiff's argument, under *Rembert*, is that a Debtor must have a personal "intent to repay" the debt when it is incurred, or the debt is automatically nondischargeable for fraud. This "intent to repay" requirement is, in Plaintiff's argument, a "gotcha!" exception to the more general requirement that courts are to look at the totality of the circumstances in determining the existence of an intent to defraud.

If that were the case, this would be an example of a nondischargeable debt for fraud: A college-age daughter has a credit card that is paid every month by her father. The father is struck by lightning, and killed, leaving no estate. Daughter files bankruptcy, and truthfully admits that she did not intend to repay the credit card debt—she was relying on her father.[10] Under Plaintiff's reading of *Rembert* and *Holmes v. National City Bank* (*In re Holmes*), 414 B.R. 115 (E.D. Mich. 2009), the daughter's credit card charges would be a debt for fraud and nondischargeable. Similar issues could arise if the user relied on the fact that the credit card was secured by collateral that

---

[10] *See e.g.*, *Chase Bank USA, N.A. v. Ritter* (*In re Ritter*), 404 B.R. 811, 818, 829 (Bankr. E.D. Pa. 2009)(finding that creditor failed to establish credit card charges were nondischargeable partly because debtor's conduct that led to bankruptcy filing occurred after mother's death, and mother had made financial contributions to the household allowing debtor to make payments on credit card debt); *FIA Card Servs., N.A. v. George* (*In re George*), 381 B.R. 911, 916 (Bankr. M.D. Fla. 2007)(creditor failed to establish credit card charges were nondischargeable partly because debtor's father provided debtor with monthly income, which she used to pay debts, but after father became ill and passed away debtor could not pay debts as they become due and filed bankruptcy).

16

was later destroyed, or lost value.

*Rembert*'s focus on the subjective intent of the debtor to personally repay is an important factor to consider in determining fraudulent intent in credit card cases. If there is no other basis for repayment of the debt, it may be determinative. However, in *Rembert*, there was no issue regarding reliance on a third party (or collateral) to satisfy the credit card debt. Where, as here, Defendant claims to have had an expectation that the debt would be repaid—just not by her—the court cannot find fraudulent intent on just the lack of a personal intent to repay. This court holds that when there is a real subjective expectation that the debt will be paid, either by a third party or by use of collateral, that belief is part of the totality of the circumstances the court should consider in determining whether or not a credit card debtor possessed an intent to deceive a creditor.

At this stage of the proceeding, in considering the totality of the circumstances, there are genuine issues of material fact as to Defendant's knowledge of the debt and her subjective intent regarding repayment of the debt. Therefore, Plaintiff is not entitled to judgment as a matter of law on their first claim for relief.

"A debtor's honest belief that a debt would be repaid in the future, even if in hindsight found to have been very unrealistic, negates any fraudulent intent." 4 Collier on Bankruptcy ¶523.08[1] (Richard Levin & Henry J. Sommer eds., 16th ed.); *see also, Cabrera v. Wilson* (*In re Wilson*), 613 B.R. 907, 921 (Bankr. S.D. Ohio 2020). Defendant's transactions with this unknown third party was an imprudent decision. However imprudent that decision was, if she had an honest belief that the debt would be repaid by the unknown third party, that is part of the totality of the circumstances the court must consider. It should also be noted she testified that she was expecting a "large" or "big amount of money" after transmittal of the gift cards. [Doc. #44-1, pp. 13:22–25, 17:22–25, 18:5–11]. It does not appear that Defendant stated she would not pay the credit card

17

debt if she received her "big amount of money" and the debt remained unpaid. Defendant's belief that someone else was going to pay the debt, and that she would receive a large amount of money, raises genuine issues of material fact as to her subjective intent to defraud Plaintiff.

In other respects, the facts here closely track the contours of the *Rembert* opinion. In *Rembert*, the Sixth Circuit held that the debtor's conduct "was entirely consistent with a subjective intent to repay" even though her basis for believing she could repay her debts was her anticipation that she "would win enough money" gambling. 161 F.3d at 282 ("In particular, compulsive gamblers often will have a subjective (albeit often baseless) intent to repay their gambling debts with their 'expected' winnings[.]"). As in *Rembert*, Defendant here testified that she believed (though it was objectively unreasonable) that she would receive a larger amount of money after providing this unknown third party the gift cards. Defendant's belief (though unreasonable) that she would receive a large amount of money, which could have covered the debt if it was still owed, raises genuine issues of fact sufficient to render summary judgment inappropriate.

Thus, Plaintiff has not established an intent to deceive through Defendant's admissions. Defendant did not admit she intended to deceive Plaintiff. Defendant stated that she thought that the unknown third party would pay the debt. The reality of her belief in the scammer's scheme is supported by her alleged initial use of monies from the checking and savings account, money which rightfully belonged to her and not Plaintiff, to purchase gift cards before resorting to the credit card. [Doc. #1, ¶13]. Caselaw establishes that a debtor's gullibility or naivete does not equate to an intent to defraud. *See e.g., Avis Rent A Car Sys., Inc. v. Maxwell* (*In re Maxwell*), 334 B.R. 736, 741 (Bankr. M.D. Fla. 2005)(finding that the debtor, as a victim of Nigerian business scam, may have been gullible, naive, and careless, but concluding the debtor did not make a false representation with the intent to deceive when he deposited an altered check); *Hunt v. Hunt* (*In re*

18

*Hunt*), 439 B.R. 690, 692–93 (Bankr. C.D. Ill. 2007)(finding that the debtor falling victim to two separate and independent advance-fee scams showed debtor was "gullible and even quintessentially stupid," but his actions did not constitute defalcation, requiring willful, knowing, or reckless acts, under 11 U.S.C. §523(a)(4)); *Neary v. Guillet* (*In re Guillet*), 398 B.R. 869, 883–88 (Bankr. E.D. Tex. 2008)(finding that the debtor, who was an honest man and hailed by most as a wonderful doctor but a terrible businessman, falling victim to an advance fee fraudster in a "Nigerian money scam" was fairly characterized as foolish, imprudent, or irrational, but insufficient to establish fraudulent intent); *Hickory Point Bank & Tr. v. Kucera* (*In re Kucera*), 373 B.R. 878, 884–85 (Bankr. C.D. Ill. 2007)(finding that although the debtor may have been naive, debtor did not act with requisite intent to defraud when he deposited a counterfeit check debtor won in an international lottery scam); *Landmark Credit Union v. Ammons* (*In re Ammons*), 2015 WL 5063935 at *1, 2015 Bankr. LEXIS 2842 at *3 (Bankr. E.D. Wis. Aug. 26, 2015)(finding that a debtor, who fell victim to a lottery scam, depositing a check that she had won in the lottery scam was not fraudulent).

As these cases demonstrate, gullibility and a lack of sophistication can raise genuine issues of material fact as to whether or not Defendant held a subjective intent that the debt would not be repaid, or a belief that the debt would not be repaid, at the time of the credit card transactions.

Lastly, Plaintiff's citation to *Holmes* does not establish an intent to deceive under these facts. In *Holmes*, the debtor made separate specific false material misrepresentations in signed documents with an intent to deceive. *See, In re Holmes*, 414 B.R. at 118–21. In cases premised on credit card transactions, binding precedent instructs this court to review the totality of the circumstances to determine, as a matter of fact, whether a debtor subjectively intended that the

debt would be repaid when it was incurred.[11] *In re Rembert*, 141 F.3d at 281.

Plaintiff does not argue that the Defendant made a false representation at the time the credit application was signed almost twenty years ago. [Doc. #44-2, p. 6]. *Holmes* is thus distinguishable on these facts because *Holmes* analyzed whether the false representations made in the loan documents were made with the subjective intent to deceive, rather than analyzing the debtor's subjective intent to repay a credit card debt.[12] There is a distinction between making a specific written false representation with the subjective intent to deceive, and a subjective intent regarding repayment of a debt incurred in a credit card transaction. *See, In re Bradley*, 507 B.R. at 208.

In sum, at the summary judgment stage, the objective unreasonableness of Defendant's belief in the scam does not warrant an imputation of an intent to defraud Plaintiff. *See, In re Rembert*, 141 F.3d at 283 (Krupansky, J., concurring). Defendant's purchase of gift cards with the expectation that the third party would pay the gift card charges and that she would receive a large sum of money—which could have been used to repay any unpaid credit card debt remaining at that time—does not warrant an inference of fraudulent intent. *Id.* Defendant's belief that she would not need to repay the debt, in light of the totality of the circumstances, still leaves genuine issues of material fact as to her subjective intent regarding payment of the gift card debts on her credit card.[13] Defendant stated she "was scammed," and she believed this unknown third party would

---

11/ *Bradley* recognized this distinction in credit card transactions and held a debtor's "subjective intent to repay" is not a factor under the §523(a)(2)(A) *Rembert* test when there "is a separate specific false material misrepresentation." *In re Bradley*, 507 B.R. at 208.

12/ Indeed, *Holmes* makes this distinction itself, recognizing that the facts before it were readily distinguishable from credit card cases. For example, in analyzing justifiable reliance, the court rejected a number of cited cases because they were "credit card" cases and shared "no resemblance to the present case." *Holmes*, 414 B.R. at 123 n.7.

13/ Plaintiff's brief in support of their Motion for Summary Judgment also appears to argue that Defendant did not have a subjective intent to repay the debt because there were certain funds on hand that Defendant failed to use to pay the debt. However, statements made in briefs are not facts that the court can consider in deciding a motion for summary judgment. *See e.g., Dymarkowski v. McConegly (In re Martin)*, 2021 WL 150446 at *2 n.4, 2021 Bankr. LEXIS 51 at *4 n.2 (Bankr. N.D. Ohio Jan. 12, 2021)(citing *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006)). Plaintiff has not argued that this is evidence the court may consider on summary judgment or supported this assertion

repay the debt. After learning she was scammed, she immediately stopped communicating with this unknown third party. In determining intent to defraud, or lack thereof, under the totality of the circumstances, there are issues of disputed fact sufficient to render summary judgment inappropriate here, because Defendant's actions allow for the competing inference that she was an unsophisticated elderly victim of a scam, lacking an intent to deceive, rather than knowingly participating in a fraudulent scheme to defraud the Plaintiff.

2. "Creditor Justifiably Relied on the False Representation."

Having determined that Plaintiff has failed to meet its burden of proving there is no genuine issue of material fact with respect to Defendant's intent to deceive, the remaining prongs required by *Rembert* need not be analyzed. Nevertheless, the court will address "justifiable reliance," not only because it is a problematic element for Plaintiff under *Rembert*, but also because this element serves as a separate and independent basis for denying Plaintiff's Motion for Summary Judgment.

Section 523(a)(2)(A) requires "justifiable, but not reasonable, reliance" on a debtor's misrepresentations. *In re Tolliver*, 2021 WL 6061853 at \*17 (quoting *Field v. Mans*, 516 U.S. 59, 74–75, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995)). Although "justifiable reliance" and "reasonable reliance" are closely related terms, the former is a less demanding level of reliance. *Id.* "The Ninth Circuit Court of Appeals, in a case that was cited favorably by the Supreme Court in *Field v. Mans*, explained that 'justifiable reliance' is a subjective standard that takes into account a variety of factors, such as 'special knowledge, experience, and competence[.]'" *Id.* (citation omitted). Therefore, in considering "justifiable reliance, the court may consider the sophistication

---

with the type of evidence a court may consider on summary judgment. Fed. R. Civ. P. 56(c)(1). Even if this was a fact this court may consider on summary judgment, this fact must be viewed in light of the totality of the circumstances to determine, as a matter of fact, whether Defendant subjectively intended to incur debts that would not be paid. Here, under the totality of the circumstances there are genuine issues of material fact that Defendant had an intent to deceive Plaintiff sufficient to render summary judgment inappropriate. It is not disputed that Defendant did not, in fact, actually receive a large sum of money from the scammer.

of the creditor and the parties' past relationship." *Id.* (citation omitted).

Accordingly, determining whether a creditor actually relied, and whether the reliance was justified, is based on the facts and circumstances surrounding each individual case. *Field*, 516 U.S. at 70–71; *Ott v. Somogye* (*In re Somogye*), 2020 WL 1519315 at *17, 2020 Bankr. LEXIS 824 at *47 (Bankr. N.D. Ohio Mar. 30, 2020)(Whipple, J.)(citing *Haney v. Copeland* (*In re Copeland*), 291 B.R. 740, 766–67 (Bankr. E.D. Tenn. 2003)). Additionally, the Supreme Court has noted that the creditor is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field*, 516 U.S. at 71 ("Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect." (citation omitted)).

Plaintiff points to Defendant's use of the credit card for ordinary purposes since 2003, nearly twenty years, and the history of routinely providing timely payments.[14]

However, routinely providing payments does not mean justifiable reliance cannot arise as an issue when circumstances and behavior changes. In other words, justifiable reliance cannot have much meaning if a credit card issuer has absolutely no continuing obligation to monitor the account.[15] Thus, while regular payments may generally suffice in most circumstances, more may be required depending on the facts of the situation. *See e.g., id.* at 70–71; *Citibank v. Stephens* (*In re Stephens*), 302 B.R. 227, 235 (Bankr. N.D. Ohio 2003)("[A] higher degree of investigation may

---

14/ This court is not looking at the circumstances surrounding the issuance of the credit card because it was issued almost twenty years ago.

15/ Following the horse analogy in *Field v. Mans*, a history of routinely providing timely payments for charges incurred assures that a horse represented as sound does not in fact have but one eye. *See, Field*, 516 U.S. at 71. Eyesight can dim over time, however. *See, id.*

22

be required when a creditor raises the credit limit on a card that already carries with it a significant amount of debt[.]").

Viewing the evidence in the light most favorable to Defendant, Plaintiff, as a bank, is a sophisticated creditor. Defendant, on the other hand, appears to be an older and financially unsophisticated debtor. Prior to the commencement of the credit card charges, a daughter with a power-of-attorney closed both the Defendant's checking and savings accounts. The Manns were on a fixed income, yet they were making credit card payments electronically in amounts ranging from $2,485.93 to $13,765.72, outside the normal monthly billing cycle. The credit card charges that were incurred solely in pharmacies or drug stores exceeded $20,000.00 in a one-month period. There was one "fraud alert" that was resolved by the Plaintiff confirming that Defendant had made the purchases that triggered the alert. Under these facts, Plaintiff allowed Defendant to continue to use her credit card with Plaintiff to purchase gift cards, and quickly applied the large electronic payments to replenish her credit limit.

The Supreme Court, in quoting the Restatement (Second) of Torts (1976), noted that justifiability is not toothless, and ultimately depends on the qualities and characteristics of the particular plaintiff. *See, Field*, 516 U.S. at 70–71 ("Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."). There is a question as to whether or not Plaintiff, as a sophisticated creditor and a bank, should have been alerted by the changes in Defendant's account activity. Apparently, Plaintiff had some contact with Defendant's daughter about her credit card activity, although the timing is unclear. [Doc. #44-1, p. 19:19–24]. Defendant's checking and savings account were closed because they were being used for the same conduct alleged to be fraudulent towards the Plaintiff. A genuine issue for trial exists if the evidence is such that a reasonable fact finder could

find in favor of the non-moving party. Here, a genuine issue of material fact appears to exist with respect to whether Plaintiff has met their burden of proving "justifiable reliance" under §523(a)(2)(A) at the summary judgment stage.

Plaintiff also argues its reliance was justified by pointing out that Defendant's charges, totaling $4,000.00 between November 3 and November 6, 2019, "set off the VISA fraud warnings on the account." [Doc. #44-2, p. 3, ¶10]. When contacted, Defendant verified that she did, in fact, make those charges. [*Id.*]. Plaintiff argues because Defendant verified the charges, future "similar charges" did not raise any additional fraud warnings on the account. But the rest of the charges incurred were not necessarily "similar charges." Defendant incurred about $40,000.00 in charges for the December 2019 billing cycle. That is ten times the amount of the November charges that did, in fact, set off the "VISA fraud warnings." The fact that none of the December 2019 charges set off the "VISA fraud warnings" on the account, or caused any non-automated inquiries by Plaintiff, does not eliminate this issue. Viewing these facts in the light most favorable to the Defendant, these facts show that there is a genuine issue as to whether Plaintiff's reliance was justified.

Additionally, Plaintiff received "payments" that totaled approximately $79,662.05. The Manns' only monthly income was social security and pension or retirement income of $3,966.52, well below most of the interval "payments." According to Plaintiff, its reliance on these payments was justified because of the information necessary to log in to the account online and make payments. However, there still appears to be a genuine issue of material fact with respect to this element. According to Plaintiff it reasonably believed that Defendant, an elderly individual on social security and retirement income, logged in to her internet account multiple times during the month of December 2019 and made electronic payments like she never had before, totaling

24

$79,662.05. These payments differed from the Manns' previous payment history. Plaintiff nonetheless applied the payments to replenish Defendant's available credit, and made it immediately available.

Thus, there is a genuine issue of material fact as to whether or not an older individual's large increase in usage coupled with initiation of large online out-of-cycle payments should raise red flags. Plaintiff's crediting of these "payments," based on the facts and circumstances in this case, suggest a genuine issue of material fact exists with respect to the "justifiable reliance" element.

This element is also relevant as to the amount of any debt that should be held nondischargeable. *Cohen v. de la Cruz*, 523 U.S. 213, 218–19, 118 S. Ct. 1212, 1216, 140 L. Ed. 2d 341 (1998). To the extent Plaintiff seeks dischargeability of the debt consisting of all the credit card charges, including the ones that were not made for gift cards, a finding of nondischargeability for the debt arising from Defendant's ordinary purchases is not supported by the undisputed facts, viewed in the light most favorable to the non-moving party. To the extent Plaintiff seeks dischargeability of the debt consisting of the credit card charges that were solely made to make gift card purchases, including any interest, charges, costs, and fees, there are genuine issues of material fact that arise as to the point in time at which Defendant knew her purchases were part of a scam, and on the other hand, at what point in time Plaintiff's reliance ceased to be "justifiable." Seeking nondischargeability for any purchases after the first "payment" was returned raises genuine issues as to whether reliance was still justifiable at that point. To the extent a third-party scammer tricked the Plaintiff into extending credit by a fraud perpetrated by that scammer, a finding of a nondischargeable debt over Defendant's $12,000.00 credit limit is not supported by the undisputed facts, viewed in the light most favorable to the non-moving party. For all of these

25

reasons, Plaintiff is not entitled to judgment as a matter of law on its first claim for relief.

**B. Plaintiff's Second Claim for Relief.**

Plaintiff's second claim for relief in its Complaint alleges Defendant acted as a "strawman" for the unknown third party and facilitated this fraudulent scheme through acts and representations. Plaintiff's Motion argues acting as a "straw buyer" satisfies the "actual fraud" prong of §523(a)(2)(A). Thus, Plaintiff argues the credit card charges are nondischargeable for Defendant's "actual fraud."

"'Actual fraud' has two parts: actual and fraud." *Husky*, 578 U.S. at 360. The word "actual," in the context of common-law fraud, denotes any fraud that involves moral turpitude or intentional wrong. *Id.* (quoting *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1878)); *Field*, 516 U.S. at 69 (holding that the word "fraud" contains the elements ascribed to it at common law). The word "fraud" encompasses all the multifarious means that human ingenuity can design to gain an advantage over another, making a rigid and precise definition not only useless, but essentially unworkable. *See, Husky*, 578 U.S. at 360; *see also, In re Hunter*, 535 B.R. at 213. Accordingly, anything that counts as "fraud" and that is done with wrongful intent is "actual fraud." *Husky*, 578 U.S. at 360.

This "actual fraud" prong is broadly defined and includes any deceit, artifice, trick, or design involving a direct and active operation of the mind, used to circumvent and cheat another. *In re Montague*, 2021 WL 2816326 at *4; *Mellon Bank, N.A. v. Vitanovich* (*In re Vitanovich*), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001); 4 Collier on Bankruptcy ¶523.08[1] (Richard Levin & Henry J. Sommer eds., 16th ed.). Thus, "actual fraud," requires an intent to deceive or defraud. *See, Husky*, 578 U.S. at 360; *see also, In re Hunter*, 535 B.R. at 213 (quoting *Gerad v. Cole* (*In re Cole*), 164 B.R. 951, 953 (Bankr. N.D. Ohio 1993)).

For essentially the same reasons set forth above, Plaintiff has not established that

Defendant had the requisite intent to deceive or defraud necessary for "actual fraud." There are genuine issues of material fact as to whether or not Defendant knew this was a fraudulent scheme to deceive the Plaintiff.[16] To the extent Plaintiff's claim rests on allegations that Plaintiff's reliance was justifiable, it too suffers from the same defects above. [Doc. #1, ¶38]. At this stage of the proceeding, Defendant's actions allow for the competing inference that she was a victim of a scam, rather than the perpetrator, and therefore lacked an intent to deceive.

## CONCLUSION

Plaintiff has failed to establish that it is entitled to judgment as a matter of law on its claims for relief. There are genuine issues of material fact that the Defendant possessed an intent to deceive the Plaintiff and with respect to Plaintiff's justifiable reliance.

**THEREFORE**, for the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment be, and hereby is, **DENIED**.

It is **FURTHER ORDERED** that this matter will be set for further pretrial hearing to schedule a trial date and deadlines.

---

16/ Relevant here, the fraud at issue must be one perpetrated by the debtor, not someone else. As aptly stated in *In re Nofziger*:

> Bankruptcy is a uniquely personal act. A debtor's right to receive a discharge is a personal right, which should not be denied lightly. Therefore, in order to establish that a particular debt is nondischargeable, at a minimum, the creditor must establish that the debtor, not someone else in a chain of co-conspirators, took the offensive act and that the act was directed at the creditor, not someone else.

*They Might Be, Inc. v. Carter* (*In re Carter*), 593 B.R. 354, 360 (Bankr. M.D. Fla. 2018)(quoting *Kalmanson v. Nofziger* (*In re Nofziger*), 361 B.R. 236, 243–44 (Bankr. M.D. Fla. 2006)).